**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **THE CARLSON GROUP, INC., an Oregon corporation,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| | ) | **Case No.** |
| **v.** | ) ) | |
| **SCOTT DAVENPORT, BRAD KURZ, REDSTITCH LLC, an Illinois limited liability company, CHARLES O'DONNELL, ROBERT SOLOMON and UNITED WIRE CRAFT, INC., an Illinois corporation doing business as United Display Craft,** | ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

**COMPLAINT, PRELIMINARY AND
PERMANENT INJUNCTIVE RELIEF AND FOR DAMAGES**

Plaintiff, The CARLSON GROUP, INC., ("TCG "), by its attorneys, for its Complaint against defendants, SCOTT DAVENPORT ("Davenport"), BRAD KURZ ("Kurz"), REDSTITCH LLC ("RedStitch"),  CHARLES O'DONNELL ("O'Donnell"), ROBERT SOLOMON ("Solomon") and UNITED WIRE CRAFT, INC., ("United"), states as follows:

**NATURE OF THE ACTION**

1. In this action, TCG seeks preliminary and permanent injunctive relief and/or monetary damages against the Defendants for misappropriation of trade secrets in violation of Illinois' Uniform Trade Secrets Act, 765 ILCS 1065/1, *et seq.,* and the Defend Trade Secret Act of 2016, 18 U.S.C. § 1831, *et seq.,* for violations of the Stored Communications Act, 18 U.S.C. §2701, *et seq.,* for breaches of fiduciary duties and/or

inducing those breaches, for breach of reasonable contractual restrictions on the Defendants' solicitation of TCG's customers and employees, for acts of tortious interference with those contracts, and for civil conspiracy,

## THE PARTIES

2.      TCG is a corporation organized and existing under the laws of the state of Oregon, with its principle place of business in Lombard, Illinois.

3.      Defendant Davenport is an individual domiciled in the state of State of Illinois who, on information and belief, works and/or resides in DuPage County, Illinois.

4.      Defendant Kurz is an individual domiciled in the state of State of Illinois who, on information and belief, works and/or resides in DuPage County, Illinois.

5.      Defendant RedStitch is an Illinois limited liability company organized and existing under the laws of the state of Illinois.  On information and belief, RedStitch's principal place of business is located in DuPage County, Illinois.  Davenport and Kurz are Members (if not the sole Members) and Managers of RedStitch.

6.      Defendant O'Donnell is an individual domiciled in the state of Illinois who, on information and belief, works and/or resides in Cook County, Illinois.

7.      Defendant Solomon is an individual domiciled in the state of Illinois who, on information and belief, works and/or resides in Cook County, Illinois.

8.      Defendant United is a corporation organized and existing under the laws of the state of Illinois, with its principal place of business in Des Plaines, Illinois.  United conducts business under the name "United Displaycraft."

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, predicated upon both the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq*., and the Stored Communications Act, 18 U.S.C. § 2701, *et seq.* The Court has pendant jurisdiction pursuant to 28 U.S.C. § 1367 as to the remaining claims.

10.      Venue is appropriate in this district pursuant to 28 U.S.C. §1391(b) in that a substantial part of the events and omissions giving rise to the claim occurred within this judicial district, Defendants have substantial contacts with this district, Defendants have caused damage in this district, and, as set forth in greater detail below, the Defendants stipulated to the exclusive jurisdiction of any court of competent jurisdiction in the state of Florida for the resolution of any dispute between them.

## ALLEGATIONS COMMON TO ALL COUNTS

*TCG's Business and its Competitive Advantages*

11.      TCG is engaged in the business of designing, engineering, manufacturing, installing, and managing logistics of retail merchandising and point-of-purchase (POP) displays and fixtures.

12.      Over the course of many years TCG has developed and maintained confidential and proprietary processes, data, and other know-how incident to its business that it considers trade secrets, which allows TCG to deliver and sustain the optimal retail experience, faster and on a more cost effective basis than its competitors.

13.    As a result, TCG has, in particular, distinguished itself as a worldwide leader in the retail merchandising of sporting goods, apparel, footwear and other active lifestyle merchandise.

14.    TCG has expended significant time, resources and energy in the development of its trade secrets from which it derives substantial competitive advantages.

15.    TCG safeguards its trade secrets, restricting access thereto, and requiring those who have access to execute agreements with strict confidentiality provisions therein.

### *TCG's Employment Agreements with the individual Defendants*

16.    Davenport, Kurz, O'Donnell, and Solomon (the "Individual Defendants") are former employees of TCG.

17.    Davenport was hired by TCG as an Account Director on or about November 18, 2008.

18.    After extensive lobbying for a sales management role, on or about January 1, 2015, Davenport was promoted by TCG to the key position of Director of Sales, becoming a member of the Senior Management Team.  Davenport remained in this role until he resigned in January 2016 (together with Kurz) to form RedStitch.

19.    As TCG's Director of Sales, Davenport was solely responsible for management and oversight of TCG's sales teams and marketing efforts.

20.    In connection with his promotion to the position of Director of Sales, Davenport obtained complete access to all of TCG's client, prospect and target files, all of TCG's client contracts, all of TCG's client/prospect presentation materials, and all TCG marketing plans and strategies.

4

21.     Moreover, as a member of TCG's Senior Management Team, Davenport obtained critical business information made available only to members of TCG's Senior Management Team, including detailed information about TCG's financial performance, competitive position in the industry, pricing models, TCG's strategic plans relating to marketing, sales, production and human resources, and TCG's employee compensation and incentive plans.

22.     Kurz was hired by TCG as staff designer on or about April 23, 2007.

23.     Kurz was promoted by TCG to the key position of Creative Director on September 1, 2011, in which role he served until he resigned in January 2016 (together with Davenport) to form RedStitch.

24.     As TCG's Creative Director, Kurz was responsible for the management and oversight of the design department and function, and interfaced with the sales team on all client matters that involved design work and on new business development efforts.

25.     In connection with his promotion to Creative Director, Kurz obtained complete access to all of TCG's client, prospect and target files, all of its client contracts, and all of its client/prospect presentation materials.

26.     Moreover, like Davenport, Kurz also obtained critical business information made available only to members of TCG's Senior Management Team, including detailed information about TCG's financial performance, competitive position in the industry, pricing models, TCG's strategic plans relating to marketing, sales, production and human resources, and TCG's employee compensation and incentive plans.

27.     O'Donnell was hired by TCG as a Project Manager April 24, 2012, and promoted to the position of Senior Account Manager on or about November 24, 2013 at the urging of Davenport. O'Donnell reported to Davenport while he was Director of Sales.

28.     O'Donnell was terminated on October 27, 2016 based upon documented poor performance, failure to comply with TCG rules and procedures, and failure to follow proscribed job duties.

29.     Solomon was hired by TCG as a Program Coordinator on or about November 15, 2010, and at the urging of Davenport, was promoted into the position of Account Manager on or about April 6, 2015.

30.     At or around the time that Davenport began planning his departure from TCG, he promoted Solomon to the TCG sales team.  Accordingly, Solomon reported directly to Davenport until the time that Davenport resigned.

31.     Solomon resigned his position with TCG July 13, 2016.

32.     Each of the Individual Defendants executed one or more written employment agreements with TCG.

33.     Davenport executed his original Employment Agreement on or about November 7, 2008, then executed a new Agreement on or about December 10, 2014 in connection with his promotion, receiving a material increase in compensation in connection therewith.  A copy of the December 2014 Agreement, which superseded the earlier Agreement, is submitted herewith as Exhibit A.

34.     Kurz executed his original Employment Agreement on or about April 23, 2007, then executed a new Agreement on or about September 1, 2011 in connection with

his promotion, receiving a material increase in compensation in connection therewith.  A copy of the September Agreement, which superseded the earlier Agreement, is submitted herewith as Exhibit B.

35.     O'Donnell executed his original Employment Agreement on or about April 24, 2012, then executed a new Agreement on or about November 4, 2013 in connection with his promotion, receiving a material increase in compensation in connection therewith.   A copy of the November 2013 Agreement, which superseded the earlier Agreement, is submitted herewith as Exhibit C.

36.     Solomon executed his original Employment Agreement in or about November 2010, then executed a new Agreement on or about April 6, 2015 in connection with his promotion, receiving a material increase in compensation in connection therewith.  A copy of the Agreement is submitted herewith as Exhibit D.

37.      Among other things, the Employment Agreements submitted herewith required each of the Individual Defendants to devote their full-time attention and energy to TCG's business.

38.     The Employment Agreements also required that during the course of their employment, each of the Individual Defendants would refrain from engaging in any business activity or making any investment in a venture in competition or conflict with TCG, or investing in any venture that could reasonably lead to a conflict of interest relative to TCG.

39.     Similarly, in each of the Employment Agreements, each of the Individual Defendants: (a) acknowledged that they would be gaining access to "Trade Secrets" and "Confidential Information" (as those terms are defined therein); (b) agreed to safeguard

and maintain the same in strict confidence; (c) agreed to use the Trade Secrets and Confidential Information solely in performing their duties for TCG; and (d) agreed never to disclose to or permit a third party to use TCG's Trade Secrets and Confidential Information.

40. Moreover, each of the Employment Agreements required that for a period of two years following their termination, each of the Individual Defendants would refrain from: (a) directly or indirectly soliciting, accepting business from, performing services for and/or transacting business with any TCG client, (b) using any TCG trade contacts; (c) directly or indirectly soliciting any TCG employee for themselves or any competitive company; and (d) directly or indirectly diverting or attempting to divert any business or potential business from TCG.

41. To that end, the Employment Agreements required each of the Individual Defendants to notify TCG of any subsequent employment during the two year restriction period (within five days of accepting employment), and also required the Individual Defendants to provide their new employer with a copy of their respective TCG employment agreements *before* commencing work for their new employer.

42. Finally, each of the Employment Agreements contemplated that *except for matters of injunctive relief*, disputes arising out of or relating to the Agreement or an Individual Defendant's employment with TCG would be submitted to arbitration.

### *United's Unsolicited Interest in TCG*

43. In late 2014, United contacted TCG's Chief Operating Officer to express United's interest in a possible acquisition of TCG.

44.     Like TCG, United is engaged in the business of designing and manufacturing of POP displays, display racks, and other store fixtures.

45.     United, however, has limited presence or penetration in TCG's niche segment of sporting goods, apparel, footwear and active lifestyle merchandising and expressed interested in acquiring TCG in order to gain a position in that segment, which would otherwise require United to invest heavily in staff and marketing over a prolonged period of time.

46.     To facilitate preliminary discussions, TCG and United entered into a Mutual Confidentiality Agreement dated December 20, 2014.

47.     Over the course of the next few months, United requested and received certain general information about TCG's business that was understood by both parties to be confidential. TCG refused at the initial exploratory stages to provide any detailed information regarding its customers, and/or its employees due to the preliminary nature of the discussions.

48.     TCG ended its discussions with United in late April, 2015, after receiving a delayed letter of intent from United that was unacceptable. In fact, the nature of the offer called into question whether United had approached its discussions with TCG in good faith.

### The Defendants' Scheme To Misappropriate TCG Trade Secrets

49.     Beginning on or about June 1, 2015 (the precise date being unknown to TCG), while they were employed by and part of the Senior Management Team of TCG, Davenport and Kurz began conspiring to start a new firm that would compete with TCG.

50.     On information and belief, part of the planning by Davenport and Kurz included the misappropriation of TCG's trade secrets and proprietary information.

51.     Despite their contractual obligations to avoid even the appearance of a conflict of interest, Davenport and Kurz concealed their plans from TCG's senior management for the last seven months of their employment.

52.     As a result, Davenport and Kurz continued to receive sensitive and valuable confidential information about TCG while they were planning to compete with TCG.

53.     Moreover, whether by design in anticipation of competing with TCG or the result of neglect of his duties to TCG, Davenport wholly failed to fulfill his duties as Director of Sales during the several months he prepared and planned to launch his competitive venture.

54.     Indeed, just before announcing his departure, and while he was planning his new competitive startup company, Davenport formally projected (for TCG's Business Plan) that TCG's sales to the customers for which he was *personally* responsible (not including the rest of his team) would exceed $5,000,000 for 2016 (consistent with the results for 2015).

55.     In fact, as a result of Davenport's neglect of the sales dramatically pipeline or his purposeful diversion of the expected business, the actual sales to those customers lagged substantially, and will barely eclipse $1,000,000 for the year.

56.     Moreover, despite his fiduciary duties to TCG and the express provisions of his Employment Agreement, Davenport began soliciting TCG employees to join him in his new venture even before he ended his employment with TCG.

57.     An investigation by TCG has revealed that Davenport exchanged hundreds of text communications with Megan B., a member of TCG design staff, between June, 2015 and (when he decided to launch his competitive venture) and January 29, 2016, when he left TCG's employ.  Most of the after business hours and on weekends so as to avoid detection.

58.     Davenport and Kurz finally announced their decision to leave TCG on January 4, 2016 to TCG's COO and Director of HR.

59.     At the time, Davenport and Kurz advised TCG's senior management that they were starting a design firm called "RedStitch" and when directly questioned claimed that they would not be offering any services in competition with TCG and that no one else at TCG knew of their plans.

60.     Before they departed, Davenport and Kurz were expressly reminded of and acknowledged their contractual obligations to refrain from soliciting or servicing any TCG client and/or employees.

61.     Nevertheless, without regard to the restrictions in their Employment Agreements, after he gave notice but before leaving TCG's employ, Davenport solicited a TCG Account Manager, Ryan H., stating, in words or substance, "when I get our feet on the ground, I will be calling you."

62.     After forming RedStitch, and without regard to the restrictions in their Employment Agreements, Davenport has continued his solicitation of Ryan H., texting him that "you need to get out of there."

11

63.     On information and belief, prior to or shortly after leaving TCG, Davenport and Kurz also contacted United to begin discussions about directly or indirectly joining forces to directly compete with TCG.

64.     At some point, and without regards to the terms of their respective Employment Agreements, TCG believes that Davenport and Kurz began soliciting O'Donnell and Solomon about leaving TCG to join them in their competitive venture at an appropriate time.

65.     Moreover, and without regards to the terms of their respective Employment Agreements, TCG has determined that either prior to or shortly after leaving TCG, Davenport and/or Kurz began soliciting multiple TCG customers on behalf of RedStitch and/or United.

66.     On numerous occasions in 2016 (shortly after Davenport and Kurz had left), TCG's COO asked O'Donnell and Solomon if either had seen RedStitch at any industry event, or received any indication that Davenport, Kurz were soliciting TCG's customers in violation of their Employment Agreements.

67.     In response, O'Donnell and Solomon consistently responded that they had neither encountered RedStitch at any industry event, nor received any indication that Davenport or Kurz was soliciting TCG's customers.

68.      In fact, O'Donnell and/or Solomon met with RedStitch at numerous industry events, and had actual knowledge of such improper solicitation by Davenport and RedStitch.

69.     Indeed, there exists a photograph recovered from O'Donnell's company issued mobile phone that had been taken of Davenport posing with one of TCG's major

clients (for which O'Donnell and Solomon were each responsible) at Global Shop, an industry event held in late March 2016 in Las Vegas Nevada. O'Donnell attended Global Shop while he was employed by and at the expense of TCG.

70.     At the same time that O'Donnell was actively and improperly concealing this critical information from TCG, he was negotiating with RedStitch and United about joining their team and establishing a firm competitive to TCG.

71.     In an April 26, 2016 email (recovered from O'Donnell's company issued mobile phone) to United's Chief Executive, O'Donnell noted that RedStitch's and United's respective operations "will dovetail well together."

72.     United provided RedStitch with critical production and logistics capability, while RedStitch offered United immediate access to TCG's trade secrets and customer relationships to accelerate its market penetration.

73.     In the same email, O'Donnell further commented that he was ready to make the move to RedStitch, but agreed that United's idea of having him undergo "onboarding at [United]" would better his understanding of United's procedure "and prepare to help meld the organizations."

74.     And in a series of May 2016 emails between Davenport and O'Donnell, the two discussed the significant to RedStitch of having "United's backing," the critical need to "build a platform to align United and RedStitch," and setting forth an organization structure based upon principles "learned from TCG."

75.     While O'Donnell methodically planned his departure from TCG, he failed to fulfill his duties to TCG.

13

76.     Indeed, O'Donnell's assigned clients were projected to generate approximately $2,300,000 in revenue during 2016 (consistent with 2015 results), but will fall woefully short and will likely only produce $730,000 in revenue by year-end.

77.     Similarly, the 2016 revenue projected for Solomon's clients also suspiciously plunged.  Instead of the more than $2,436,000 that was projected (based on 2015 actual results), Solomon's clients will only produce $725,000 in revenue by year-end.

78.     On information and belief, the dramatically poor sales performance for 2016 was the direct and proximate result of either neglect of the sales pipeline by Davenport, Solomon, and O'Donnell, or more likely, the purposeful misdirection of sales in anticipation of leaving and competing with TCG.

79.     Indeed, emails recovered from O'Donnell's company issued phone indicate that O'Donnell began communicating with his major client using a "Gmail" account months prior to his termination.  That client has since diverted some of its TCG business to RedStitch and/or United.

80.      On information and belief, O'Donnell and Solomon have since joined RedStitch and/or United, but neither advised TCG of the same as required by their respective Employment Agreements.

81.     On August 31, 2016, TCG, through its lawyers demanded in writing that Davenport, and Kurz cease violating the non-solicitation provisions in their Employment Agreements.

82.     TLC has learned, however, that without regard to this demand or regard for the provisions of their respective Employment Agreements, Davenport and Kurz have

continued to solicit and service TCG clients, either directly through RedStitch or indirectly through United.

83.     TLC has also learned that without regard to the provisions of his Employment Agreement, Davenport continues to directly or indirectly interfere with TCG's employee relationships, contacting TCG sales staff via text messages (sent to their Company owned phones) encouraging them to leave TCG.

84.     In one specific instance, Davenport recently texted Ryan H. again, soliciting him with a message: "Why haven't you quit that shit box yet?"

85.     As a result of the aforementioned conduct by the Defendants, TCG has been injured, already having lost a substantial amount of business.

## COUNT I

### (Injunctive Relief for Violation of the Uniform Trade Secrets Act, 765 ILCS 1065/1 *et seq.,* and the Defend Trade Secret Act of 2016, 18 U.S.C. § 1831, *et seq.*)

86.     TCG re-alleges and incorporates Paragraphs 1 through 84 as though fully set forth herein.

87.     TCG sells goods and procures materials using and for use in interstate commerce.

88.     As set forth above, during their employment, the Individual Defendants became privy to and acquired information regarding TCG which is otherwise highly confidential and proprietary.

89.     During their employment, some or all the Individual Defendants became privy to and acquired information regarding TCG's proprietary methods, processes and procedures, including its methods and tools for budgeting and annual planning,

15

estimating templates, pricing models and strategies, its Scope of Work ordering system, domestic and off-shore supply chain partners, its CRM system, its prospecting and sales strategies and techniques, its client programs and its sales and distribution history and projections.

90.     TCG derives substantial independent economic value from the referenced information, processes and procedures not being generally known to the public.

91.     TCG takes extensive and deliberate reasonable steps designed to maintain the secrecy of its information, processes and procedures, including but not limited to restricting the access thereto and, and having employees sign employment agreements with confidentiality and non-disclosure provisions.  All TCG employees are formally reminded on a quarterly basis that TCG's business information is to be kept confidential.

92.     Without regard to the provisions of the Employment Agreements submitted, herewith, the Individual Defendants have used or disclosed TCG's information, processes and procedures to one or more third parties, including RedStitch and United, to further their own interests at the expense of TCG.

93.     Even if they have not already purposefully TCG's disclosed Trade Secrets, as part of TCG's Senior Management Team, Davenport and Kurz became privy to Trade Secrets that they will inevitably use on behalf of RedStitch and/or inevitably disclose to United if they are permitted to continue their union and collaboration.

94.     The use or disclosure described herein by the Defendants constitutes a misappropriation of trade secrets in violation of the Illinois Trade Secrets Act and the Defend Trade Secrets Act of 2016.

95.     TCG has a performed valid and protectable interest in protecting its Trade Secrets and confidential information.

96.     The misappropriation of trade secrets by the Defendants described above has caused, and will continue to cause irreparable damage and harm to TCG and its business.

97.     TCG has no adequate remedy at law for the misappropriation of Trade Secrets described above.

98.     The public interest would be well served by preliminarily and permanently enjoining the Defendants' use of TCG's trade secrets.

WHEREFORE, TCG respectfully requests the entry of an order preliminarily and permanently enjoining Defendants and their respective affiliates, assignees, members, shareholders, directors, officers, managers, employees, agents and/or representatives from using or disclosing TCG's trade secrets, awarding TCG its costs and attorneys' fees, and granting such other relief as this Court may deem just and appropriate.

## COUNT II

**(Damages for Violation of the Uniform Trade Secrets Act, and the Defend Trade Secret Act of 2016)**

99.     TCG re-alleges and incorporates Paragraphs 1 through 98 as though fully set forth herein.

100.    As a direct and proximate result of Defendants' misappropriation of trade secrets as described above, TCG has been injured.

101.     The Defendants have acted willfully and maliciously in disclosing and/or using TCG's trade secrets, and as such should be liable for exemplary damages and attorneys' fees.

WHEREFORE, TCG respectfully requests the entry of an order of judgment in its favor and against all Defendants, jointly and severally, for the full extent of its damages in an amount to be proven at trial, an award of punitive damages against all Defendants to dissuade and deter such conduct in the future, an award of attorneys' fees as provided by the referenced Acts, plus such other relief as this Court may deem just and appropriate.

### COUNT III

**(Preliminary and Permanent Injunctive Relief to Enforce
Non-Solicitation Provisions of the Employment Agreements)**

102.     TCG re-alleges and incorporates Paragraphs 1 through 101, as though fully set forth herein.

103.     The Employment Agreements submitted herewith constitute binding and enforceable contracts between the Individual Defendants and TCG.

104.     The prohibitions on solicitation of customers and employees set forth in the Agreements are reasonable in both time and scope.

105.     TCG performed its obligations under the Employment Agreements.

106.     The Individual Defendants have breached the Employment Agreements in the manner described herein.

107.     TCG has a performed valid and protectable interest in enforcing the confidentiality and non-solicitation provisions of the Agreements.

108.     The breach of the Employment Agreements by the Individual Defendants described above has caused, and will continue to cause irreparable damage and harm to TCG and its business.

109.     TCG has no adequate remedy at law for the breach of the non-solicitation provisions of the Agreements by the Individual Defendants.

110.     The public interest would be well served by preliminarily and permanently enjoining the Defendants' breaches of their respective Employment Agreements.

WHEREFORE, TCG respectfully requests the entry of an order preliminarily and permanently enjoining the Individual Defendants and their respective affiliates, assignees, members, shareholders, directors, officers, managers, employees, agents and/or representatives from violating the non-solicitation provisions of the Employment Agreements, awarding TCG its costs, and granting such other relief as this Court may deem just and appropriate.

## COUNT IV

### (Damages for Breach of the Employment Agreements)

111.     TCG re-alleges and incorporates Paragraphs 1 through 110 as though fully set forth herein.

112.     As a direct and proximate result of the Individual Defendants' breach of the Employment Agreements described above, TCG has been injured.

WHEREFORE, TCG respectfully requests the entry of an order of judgment in its favor and against all Defendants, for the full extent of its damages in an amount to be proven at trial, plus such other relief as this Court may deem just and appropriate.

## COUNT V

### (Tortious Interference with Contract)

113.     TCG re-alleges and incorporates Paragraphs 1 through 112, as though fully set forth herein.

114.     TCG had valid and enforceable Employment Agreements with the Individual Defendants.

115.     Davenport, Kurz, RedStitch, and United were at all times aware of the existence of the Agreements, as well as the provisions therein relating to the confidentiality and non-disclosure of information and precluding the post-termination solicitation of employees and clients.

116.     Davenport, Kurz, RedStitch, and United induced the Individual Defendants to breach their Employment Agreements in the manner described herein.

117.     As a direct and proximate result of this conduct by these Defendants, TCG has been damaged.

118.     These Defendants acted willfully and maliciously in interfering with the referenced contractual obligations.

WHEREFORE, TCG respectfully requests the entry of an order of judgment in its favor and against Davenport, Kurz, RedStitch, and United, jointly and severally, for the full extent of its damages in an amount to be proven at trial, an award of punitive damages against these Defendants to dissuade and deter such conduct in the future, and granting such other relief as this Court may deem just and appropriate.

## COUNT VI

### (Damages for Breach of Fiduciary Duties)

119.     TCG incorporates the allegations contained in paragraphs 1 through 111 as though set forth herein.

120.     As employees of TCG, each of the Individual Defendants owed TCG fiduciary duties of loyalty and care.

121.     The Individual Defendants breached those fiduciary duties to TCG in the manner described above.

122.     As a direct and proximate result of this conduct by the Individual Defendants, TCG has been damaged.

123.     The Individual Defendants acted willfully and maliciously in breaching their fiduciary duties to TCG.

WHEREFORE, TCG respectfully requests the entry of an order of judgment in its favor and against each of the Individual Defendants, jointly and severally, for the full extent of its damages in an amount to be proven at trial, ordering the disgorgement of any and wages, commissions and bonus received by these Defendants during their period of disloyalty, awarding punitive damages against these Defendants to dissuade and deter such conduct in the future, and granting such other relief as this Court may deem just and appropriate.

## COUNT VI

### (Damages for Aiding and Abetting Breaches of Fiduciary Duties)

124.     TCG incorporates the allegations contained in paragraphs 1 through 123 as though set forth herein.

125.     On information and belief, RedStitch and United participated, actively encouraged and substantially assisted conduct that they knew was a breach of the Individual Defendants' fiduciary duties of loyalty and care to TCG.

WHEREFORE, TCG respectfully requests the entry of an order of judgment in its favor and against Red Stitch and United, for the full extent of its damages in an amount to be proven at trial, ordering the disgorgement of any ill-gotten gains, including profits on sales to TCG customers, awarding punitive damages against these Defendants to dissuade and deter such conduct in the future, and granting such other relief as this Court may deem just and appropriate.

## COUNT VII

### (Civil Conspiracy)

126.     TCG incorporates the allegations contained in paragraphs 1 through 125 as though set forth herein.

127.     As set forth above, each of the Defendants knowingly and purposefully acted in concert as part of a wrongful scheme to enrich themselves at the expense of TCG in the manner described above.

128.     As a direct and proximate result of their conspiracy, TCG has been injured.

WHEREFORE, TCG respectfully requests the entry of an order of judgment in its favor and against each of the Defendants, jointly and severally, for the full extent of its damages in an amount to be proven at trial, and granting such other relief as this Court may deem just and appropriate.

22

## COUNT VIII

**(Versus O'Donnell for Violation of the Stored
Communications Act, 18 U.S.C. §2701, *et seq.,*)**

129.     TCG incorporates the allegations contained in paragraphs 1 through 128 as though set forth herein.

130.     During the course of his employment with TCG, O'Donnell had use of a company-owned mobile smartphone.

131.     A mobile smartphone is a facility through which electronic communication service is provided, as that term is used in the Stored Communications Act, 18 U.S.C. § 2701(a)(hereinafter, the "Act").

132.     Pursuant to the terms of the Employee Handbook, O'Donnell acknowledged that the mobile smartphone he was using remained the exclusive property of TCG, and that all material created, viewed, transmitted or stored on the device was the property of TCG.

133.     Upon the termination of his employment, O'Donnell was required to surrender (and did surrender) his phone to TCG.

134.     Without regard to the referenced policy, approximately four hours after his termination, and without any authority to do so, O'Donnell intentionally used some means or artifice to remotely access the smartphone (while it was in TCG's possession) and "wipe" it clean, thereby erasing all of the data and electronically stored communications thereon.

135.     The aforementioned conduct constitutes a violation of the Act.

136.     As a result of the aforementioned conduct, TCG has been injured in amount of at least $1000, which is the statutory minimum that must be awarded in a civil action for a violation of the Act pursuant to 18 U.S.C. § 2707(b) and (c).

137.     O'Donnell's actions were willful and intentional, for which the Court should award punitive damages as authorized by 18 U.S.C. § 2707(c).

WHEREFORE, TCG respectfully requests the entry of an order of judgment in its favor and against O'Donnell for the greater of $1000 or the full extent of its damages proven at trial, awarding punitive damages and attorneys' fees and other litigation costs reasonably incurred pursuant to 18 U.S.C. § 2707(b)(3), and granting such other relief as this Court may deem just and appropriate.

Respectfully submitted,

**THE CARLSON GROUP, INC.**

By:   */s/ George J. Spathis*

One of its Attorneys

George J. Spathis, Esq.
Jason B. Hirsh
Erin M. Isaacson
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle Street, Suite 1300
Chicago, Illinois 60602
(312) 346-8380
gspathis@lplegal.com
jhirsh@lplegal.com
eisaacson@lplegal.com