**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE CARLSON GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-cv-10520 |
| | ) | |
| SCOTT DAVENPORT, BRAD KURZ, | ) | |
| REDSTITCH LLC, CHARLES O'DONNELL, | ) | |
| ROBERT SOLOMON, and UNITED WIRE | ) | |
| CRAFT, INC., d/b/a UNITED DISPLAY CRAFT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, United States District Judge:

On December 5, 2016, Plaintiff The Carlson Group ("TCG") petitioned the Court for entry of a temporary restraining order and preliminary injunction against Defendants Scott Davenport ("Davenport"), Brad Kurz ("Kurz"), RedStitch LLC (RedStitch"), Robert Solomon ("Solomon") and United Wire Craft, Inc. ("United") (collectively, Defendants").[1] (R.21). After the parties submitted briefing and affidavit evidence, the Court held a hearing on December 8, 2016. (R.37). No party offered live witness testimony. During the course of that hearing, the parties reached agreement on certain parts of TCG's motion, specifically those related to Defendants' solicitation of and/or interference with TCG's employees and supply chain partners. The Court took the remainder of TCG's motion under advisement. (*Id.*). For the reasons set forth below, the Court now denies that motion. (R.21).

---

[1] Defendant Charles O'Donnell ("O'Donnell") previously entered into a stipulated order of preliminary injunction with TCG. (R.15).

## BACKGROUND

TCG—through its global network of supply chain partners—designs, engineers, manufactures, installs, and manages point-of-purchase ("POP") displays and fixtures for manufacturing and retail clients, principally those in the sporting goods, apparel, footwear, and active lifestyle merchandise industry, such as Nike, Oakley, and Columbia. TCG, thus, is a "one-stop shop" within the POP display industry – an estimated $3 billion industry with a diverse customer base. This industry, however, is competitive, with customers frequently shopping design and price among POP display providers. (R.42, Adams Decl. ¶¶ 1-3, 5-32; R.43, Suppl. Adams Decl. ¶¶ 2-3, 18; R.31-1, Davenport Decl. ¶¶ 8, 11, 19, 24, 48; R.31-2, Carrigan Decl. ¶ 15; R.31-7, Nielsen Decl. ¶ 2). If a particular provider "wins the opportunity to manufacture a new retail display for a customer," though, it "generally can expect 3-5 years of re-orders of that display," which usually represent the highest margin sales orders. (R.43, Suppl. Adams Decl. ¶ 9).

Davenport, Kurz, and Solomon are former TCG employees, each of whom signed an Employment Agreement containing a confidentiality provision and non-solicitation provision. (R.1-2, R.1-3, R.1-5 at Sec. 7, Sec. 9). Davenport served as TCG's Director of Sales, while Kurz served as Creative Director. As members of the Senior Management Team, both Davenport and Kurz had complete access to TCG's client, prospect, and target files, including access to TCG's Customer Relationship Management ("CRM") system. (R.42, Adams Decl. ¶¶ 40-41, 44-45; R.43, Suppl. Adams Decl. ¶ 6). Over the years, Davenport and Kurz worked closely together and shared frustrations about TCG's Chief Operating Officer, Mark Adams ("Adams"). By late 2015, they had developed an outline to start their own business, RedStitch. (R.31-1, Davenport Decl. ¶¶ 28-32, 39; R.31-3, Kurz Decl. ¶¶ 5-7). In January 2016, Davenport and Kurz resigned

2

from TCG to form RedStitch. (*Id.*). Solomon, meanwhile, was an Account Manager who reported to Davenport, and then to Adams following Davenport's departure. (R.42, Adams Decl. ¶ 46). Dissatisfied with TCG, Solomon resigned in June 2016 and joined RedStitch. (R.31-4, Solomon Decl. ¶¶ 6-7, 9).

The membership of RedStitch consists of Davenport, Kurz, and United – another POP display provider. According to Defendants, to date, "100% of RedStitch's projects have been new projects [Davenport and Kurz] did not work on at TCG, and the majority of that work has been on strategy and design for store environments and POP displays." (R.31-1, Davenport Decl. ¶¶ 40-42; R.31-2, Carrigan Decl. ¶¶ 2-3, 7; R.31-3, Kurz Decl. ¶ 19). According to TCG's complaint in this action, however, Davenport and Kurz "conspired" to misappropriate TCG trade secrets, to join forces with a direct competitor, to solicit and service TCG clients, and to induce TCG employees to leave TCG's employment. (R.1). TCG seeks "preliminary and permanent injunctive relief and/or monetary damages against the Defendants for misappropriation of trade secrets in violation of Illinois' Uniform Trade Secrets Act, 765 ILCS 1065/1, *et seq.*, and the Defend Trade Secret Act of 2016, 18 U.S.C. § 1831 . . . for breaches of fiduciary duties . . . for breaches of reasonable contractual restrictions on the Defendants' solicitation of TCG's customers and employees, for acts of tortious interference with those contracts, and for civil conspiracy." (*Id.* ¶ 1). As relevant to the present motion, TCG requests preliminary relief to prevent the solicitation of TCG's existing and prospective customers in violation of the Employment Agreements executed by Davenport, Kurz, and Solomon.

## LEGAL STANDARD

To obtain a temporary restraining order or preliminary injunction, "the moving party must make an initial showing that (1) it will suffer irreparable harm in the period before final

resolution of its claims; (2) traditional legal remedies are inadequate; and (3) the claim has some likelihood of success on the merits. If the moving party makes this showing, the court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 323-24 (7th Cir. 2015) (citations omitted); *see also Jones v. Markiewicz-Qualkinbush*, --- F.3d ----, No. 16-3514, 2016 WL 7030354, at *3 (7th Cir. Dec. 2, 2016) (same). The same standard applies with respect to both temporary restraining orders and preliminary injunction orders. *See Loveless v. Chicago Bd. of Election Commissioners*, No. 04 C 5671, 2004 WL 2095662, at *2 (N.D. Ill. Sept. 17, 2004).

TCG noticed its motion under Federal Rule of Civil Procedure 65(a) and 65(b). (R.21). *See* 11A Charles Alan Wright *et al.*, FEDERAL PRACTICE AND PROCEDURE § 2951 (3d ed.) ("Applicants for injunctive relief occasionally are faced with the possibility that irreparable injury will occur before the hearing for a preliminary injunction required by Rule 65(a) can be held. In that event a temporary restraining order may be available under Rule 65(b)"). Here, Defendants briefed their opposition, submitted evidence, and appeared for oral argument. TCG, too, submitted initial and supplemental declarations, and appeared for oral argument. TCG has not indicated to the Court any additional evidence it intends to introduce to support its Rule 65(a) and 65(b) motion, even though it has known about these issues for months. Accordingly, the Court treats TCG's motion as one for a preliminary injunction. *See id.* ("When the opposing party actually receives notice of the application for a restraining order, the procedure that is followed does not differ functionally from that on an application for a preliminary injunction and the proceeding is not subject to any special requirements. Indeed, even if a court denominates an order as a 'temporary restraining order' in this situation, Rule 65(b) may not apply and, if there is

4

an adversary hearing . . . the 'temporary restraining order' may be treated as a preliminary injunction"); *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 946 (7th Cir. 2006).

## ANALYSIS

I. **Likelihood of Success on TCG's Contract Claims**

To obtain preliminary relief, TCG must first demonstrate "at least a negligible chance of success on the merits." *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016) (citing *Curtis v. Thompson*, 840 F.2d 1291, 1296 (7th Cir. 1988) ("where the plaintiff is unable to establish this minimum threshold, the harm to the plaintiff will never override his failure to establish a likelihood of success")). Given the parties' agreement concerning TCG's employees and supply chain partners—the latter of which was the focus of TCG's trade secret misappropriation claim (R.42, Adams Decl. ¶¶ 6, 31)—and given TCG's failure to address its breach of fiduciary duty, tortious interference, and civil conspiracy claims, the Court limits its analysis to TCG's contract claims as related to the solicitation of TCG customers.

A. **Contract Enforceability**

The Employment Agreements contain the following provision prohibiting the improper disclosure and/or use of "Confidential Information:"

> Employee recognizes that Employee will occupy a position of trust with respect to Confidential Information and/or Trade Secrets of the Company and such information will be imparted to and/or used by him or her from time to time in the course of his or her duties . . . "Confidential Information" means all information of or concerning the business of Company, which is not generally known to its competitors or the public and does not qualify as a Trade Secret. Confidential Information includes, but is not limited to, information relating to the Company's products and services, its business and financial plans, its marketing, research and development plans, its current, past and potential customers and suppliers (including each of their identities, contract terms, preferences, proposals, plans and contact information), its employees (including benefit and compensation programs and plans, contact information, performance and experience information, and personal information) and its operating techniques, policies and procedures. Confidential Information does not include information that lawfully is or has become generally or publicly known outside the Company, other than through the

5

> unlawful or improper act or omission of any person that has or had an obligation of non-disclosure or non-use with respect to such information, including without limitation by reason of the Employee's breach of this Agreement. Employee therefore agrees that . . . Employee will maintain and protect the confidentiality of the Confidential Information and Trade Secrets. Employee shall not, directly or indirectly, at any time during the term of this Agreement or thereafter use, disclose or rely upon, or permit any person or entity to use, disclose or rely upon the Company's Confidential Information or Trade Secrets, except in the performance of his or her duties hereunder and for the benefit of the Company[.]

(R.1-2, R.1-3, R.1-5 at Sec. 7).

In addition, the Employment Agreements contain the following provision prohibiting the post-employment solicitation of TCG's existing and prospective customers:

> In order to protect the Company's long-standing customer, client, and supplier relationships, and its Confidential Information and Trade Secrets, Employee agrees that during the period of Employee's employment with the Company and for a period of two (2) years following termination of such employment, for whatever reason or for no reason, Employee shall not, as an owner, manager, employee, agent, independent contractor or otherwise, directly or indirectly . . . solicit or accept business or work from or perform any Similar Services for any Client . . . [or] divert or attempt to divert any business or potential business from Company, including but not limited to, soliciting, contacting, or communicating with any Client regarding the Company or any Competitive Business.

(*Id.* at Sec. 9). The contracts define "Client" as "any individual or entity which received services from Company or for whom Company proposed to provide services at any time during the two (2) year period prior to termination of Employee's employment and with whom Employee worked or about whom employee learned Confidential Information." (*Id.*). The contracts define "Competitive Business" as "any business, person, or entity that provides in-store marketing services for retail companies in a geographic area in which the Company offers its services." (*Id.*)

Defendants now challenge the Employment Agreements as overbroad and unenforceable. "Postemployment restrictive covenants operate as partial restrictions on trade, so they are scrutinized carefully . . . For a restrictive covenant to be valid and enforceable in Illinois, the

6

terms must be reasonable and necessary to protect a legitimate business interest of the employer." *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 447, 879 N.E.2d 512, 522 (1st Dist. 2007) (citation and quotation omitted).[2] Here, the Court agrees with Defendants that enforceability concerns related to the contractual provisions under which TCG has sued—Section 7 and Section 9—preclude TCG from demonstrating "some likelihood of success" on its contract claim. *See BBL*, 809 F.3d at 323-24.

1.   **Section 7**

An overbreadth concern arises with respect to Section 7, governing the use of "Confidential Information." First, the provision purports to protect "all information of or concerning the business of Company," including without limitation, "information relating to the Company's products and services," its various "plans," the "identities" of its customers, and the "contact information" of its employees. Although Section 7 itemizes particular information in which TCG likely has a protectable interest (*e.g.*, customer "contract terms"), and excludes information "generally known to [TCG's] competitors," the broad catch-all language ("of or concerning" TCG's business), without further limitation, calls into question its enforceability. In *AssuredPartners, Inc. v. Schmitt*, for example, an Illinois court held unenforceable a provision that sought to protect "virtually every fact, plan, proposal, data, and opinion that [defendant] became aware of during the time he was employed by [plaintiff]—without regard as to whether such information was in any way proprietary or confidential in nature[.]" 2015 IL App (1st) 141863, ¶ 46, 44 N.E.3d 463, 475-76 (1st Dist. 2015). Indeed, as written, Section 7 covers

---

[2] The Employment Agreements provide: "This Agreement shall be construed and given effect in accordance with the laws of the state of Illinois." (*Id.* at Sec. 14). Under Illinois law, "[a] restrictive covenant, assuming it is ancillary to a valid employment relationship, is reasonable only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor; and (3) is not injurious to the public." *Reliable Fire Equip. Co. v. Arredondo*, 2011 IL 111871, ¶ 17, 965 N.E.2d 393, 396 (2011).

information that TCG, itself, makes known on its website, such as customer identities, marketing reports, and presentations about its retail operations. (R.31-9, van Marter Aff. ¶¶ 3-6). Such public dissemination belies the suggestion that TCG has a proprietary, confidential interest in "all information of or concerning" its business. *See Tax Track Sys. Corp. v. New Inv'r World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007) ("Tax Track need not show its information rises to the level of a trade secret, but it must nevertheless establish that it engaged in reasonable steps to keep the information confidential"). During the motion hearing, TCG's counsel pointed to Section 7's caveat that "Confidential Information does not include information that lawfully is or has become generally or publicly known outside the Company," as evidence of its reasonableness. As the *AssuredPartners* court observed with respect to similar language, however, "[t]here is a great deal of information that is not 'generally' known to the public; not all of it merits protection under a confidentiality provision." 44 N.E.3d at 476 (examining the caveat, "unless and to the extent that the Confidential Information (i) becomes generally known to and available for use by the public"). The Court is not convinced, therefore, that such language saves Section 7 from unenforceability in Illinois.

Furthermore, Section 7 applies without durational or geographic limitation, prohibiting employees from "using, disclosing, or relying upon" Confidential Information "at any time during the term of this Agreement or *thereafter*" unless authorized by TCG. Illinois courts have invalidated confidentiality agreements lacking such limitations. *See N. Am. Paper Co. v. Unterberger*, 172 Ill. App. 3d 410, 415, 526 N.E.2d 621, 624 (1st Dist. 1988) ("Since employment nondisclosure agreements affect a State interest, that is, the free flow of information necessary for commercial competition, they are enforceable only if their chronological and geographical limitations are reasonable") (citing *Cincinnati Tool Steel Co. v. Breed*, 136 Ill. App.

8

3d 267, 276, 482 N.E.2d 170, 175 (2d Dist. 1985)); *Packaging v. Hein*, No. 14 C 09670, 2015 WL 6164957, at *7 (N.D. Ill. Oct. 20, 2015) ("No Illinois court has stated that the [Illinois Trade Secrets Act] overruled or abrogated *Cincinnati Tool,* and its reasoning remains persuasive as to confidential information that falls short of a trade secret")). Even if not determinative of Section 7's validity, the omission of a temporal and/or geographic limitation bears on its reasonableness. *See Thomas & Betts Corp. v. Panduit Corp.*, No. 93 C 4017, 1999 WL 261861, at *2 (N.D. Ill. Apr. 8, 1999).

### 2. Section 9

Similar enforceability concerns arise with respect to Section 9, the non-solicitation provision. "A non-solicitation clause is only valid if reasonably related to the employer's interest in protecting customer relations that its employees developed while working for the employer. As a result, courts are reluctant to enforce provisions that prohibit former employees from servicing customers that they never had contact with while working for their original employer." *Cambridge*, 879 N.E.2d at 528-29 (citation and quotation omitted).

Here, Section 9 prohibits "solicit[ing] or accept[ing] business or work from . . . any Client" for "a period of two (2) years following termination of such employment[.]" "Client," meanwhile, is defined broadly as "any individual or entity which received services from Company or for whom Company proposed to provide services at any time during the two (2) year period prior to termination of Employee's employment and with whom Employee worked or about whom employee learned Confidential Information." The first clause in that definition—"which received services from Company"—has no temporal or activity-related limitation, and therefore covers past TCG clients with whom Defendants had no interaction, as well as TCG clients secured and serviced after Defendants' termination. "This is far broader than necessary to

9

protect [TCG's] interest in preventing [Davenport and Kurz] from abusing the specific client relationships [they] built up during [their] time with the company." *Cambridge*, 879 N.E.2d at 528; *AssuredPartners*, 44 N.E.3d at 474-75 (same). The second clause—concerning prospective clients "for whom Company proposed to provide services at any time during the two (2) year period prior to termination of Employee's employment"—is more narrow, applying only to those clients "with whom Employee worked or about whom employee learned Confidential Information." As discussed above, however, given the overbreadth concern relating to the definition of "Confidential Information," the Court questions the enforceability of such a clause.[3]

Whether TCG has a proprietary, protectable interest in its trade information and customer relationships is an individualized inquiry "based on the totality of the facts and circumstances of the individual case." *See Reliable Fire Equip. Co. v. Arredondo*, 2011 IL 111871, ¶ 34, 965 N.E.2d 393, 401-03 (2011). Defendants, for example, point to evidence of high customer turnover and competition within the POP display industry, as well as evidence that—due to the customized nature of each engagement—any confidential information becomes "stale" within a matter of months. TCG, on the other hand, argues that it has "well-established" relationships with certain clients, and observes that the re-order business generally involves 3-5 years of valuable, client-specific confidential information use. Even assuming a legitimate business interest exists, however, a restrictive covenant "is reasonable only if the covenant . . . is no greater than is required for the protection" of such interest. *Id.* at 396. As drafted, Section 9 extends beyond the permissible scope of protection.

Furthermore, although TCG now seeks to protect *only* 54 "active" client and 29 "actively solicited" prospects—with whom Davenport and/or Kurz interacted, or about whom they learned

---

[3] Even reading the activity-related qualification ("with whom Employee worked or about whom employee learned Confidential Information") to apply to both clauses —as urged by TCG's counsel during oral argument—TCG encounters the same overbreadth problem with respect to "Confidential Information."

"strategy" information and/or had access to CRM details while at TCG (R.43, Suppl. Adams Decl. ¶¶ 5-6)—such a request "would require this court to determine how the scope of the provision should be narrowed and to enforce it accordingly." *AssuredPartners*, 44 N.E.3d at 475. The Court, accordingly, declines to rewrite the contract provision for the purpose of affording TCG preliminary injunctive relief. *See id.* ("We decline to rescue a drafter from the risks of crafting a restrictive covenant that is patently overbroad"); *Trailer Leasing Co. v. Assocs. Commercial Corp.*, No. 96 C 2305, 1996 WL 392135, at *6 (N.D. Ill. July 10, 1996) ("the court declines to exercise its option to blue-pencil the non-disclosure agreement since it would require the court to rewrite the defining term of the restrictive covenant. The court's role is not to rewrite overly broad restrictive covenants").[4]

### B. Contract Violation

Setting aside concerns about contract enforceability, the Court also observes conflicting evidence related to Defendants' alleged breach of Section 7 and/or Section 9. "A temporary restraining order or a preliminary injunction is an extraordinary and drastic remedy, which should not be granted unless the movant carries the burden of persuasion by a clear showing." *See Capgemini Fin. Servs. USA Inc. v. Infosys Ltd.*, No. 14 C 464, 2014 WL 340206, at *1 (N.D. Ill. Jan. 30, 2014). Here, TCG has failed to make that showing with respect to the merits of its contract claim concerning customer solicitation.

TCG has offered no evidence, for example, of Defendants' use or disclosure of "Confidential Information" in violation of Section 7, beyond unsubstantiated assertions in the Adams Declaration and an innocuous employee e-mail. (R.42, Adams Decl. ¶ 61 ("RedStitch offered United wrongful access to TCG's employee lists, prospect-customer relationships, supply

---

[4] Given this disposition on contract enforceability, the Court does not address Defendants' remaining arguments concerning the adequacy of consideration to enforce Davenport and Solomon's Employment Agreements, or TCG's prior material breach of Davenport's Employment Agreement. (R.31).

11

chain partners, and other trade secrets needed to accelerate its market penetration without the developments costs and time"); R.22-1, Ex. 2, Email from O'Donnell to Davenport ("Learn from TCG: Simplify the way we work, eliminating ineffective meetings to liberate unproductive hours")). In addition, the record evidence concerning Defendants' solicitation of active, existing customers in violation of Section 9—(i) conflicting accounts of a conversation between Adams and United's president concerning RedStitch; (ii) speculation that the "chasm between projected and actual sales" indicated a purposeful diversion of business from TCG to RedStitch; (iii) speculation that the decline in TCG's re-order business was due to RedStitch's solicitation of such business; (iv) a hearsay statement concerning RedStitch's representation of WWW; (v) non-proffered "corroborating evidence" from "multiple clients" concerning RedStitch's solicitation efforts; and (vi) an e-mail reflecting RedStitch's presence at an industry trade show organized by a TCG client—does not amount to a "clear showing" of a contract breach. (R.42, Adams Decl. ¶¶ 52, 61, 68-69, 72-73, 79, 80-81; R.43, Suppl. Adams Decl. ¶ 19; R.22-1, Ex. 3; R.31-2, Carrigan Decl. ¶¶ 11-12)). That being said, the Court acknowledges evidence that Davenport and Kurz may be in technical violation of Section 9's as-written prohibition related to prospective TCG customers and/or customers for whom they performed no work while at TCG, such as the grocer Meijer. (R.31-1, Davenport Decl. ¶¶ 41-42; R.31-2, Carrigan Decl. ¶ 11; R.31-3, Kurz Decl. ¶¶ 13, 19; R.43, Suppl. Adams Decl. ¶¶ 7, 20-21, 23). Nevertheless, absent a showing of contract enforceability—which TCG has failed to provide at this stage—TCG has not demonstrated its entitlement to preliminary relief. In addition, with respect to its contract claim, TCG has failed to identify any legal basis upon which to enjoin United—a non-party to the Employment Agreements—from operating its business.

**II.     TCG's Irreparable Harm and the Adequacy of Legal Remedies**

Even assuming that TCG has demonstrated "at least a negligible chance of success on the merits," the Court is not convinced that TCG has met the standard for irreparable harm. As the Seventh Circuit recently observed, a plaintiff does not meet this standard where "money damages could make [it] whole again" should it prevail at trial. *See D.U.*, 825 at 338-39 ("the possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm") (citation omitted); *see also Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013) ("the harm to the plaintiff also must be judged irreparable— meaning not fully compensable or avoidable by the issuance of a final judgment . . . For if the harm can be fully repaired in the final judgment, there is no reason to hurry the adjudicative process"); *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005) ("If proof of particular injuries could be supplied, then the injury would be reparable by damages"). "A plaintiff may suffer irreparable harm if the nature of the loss makes monetary damages difficult to calculate." *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705-06 (7th Cir. 2005). A plaintiff may not, however, "obtain a preliminary injunction by speculating about hypothetical future injuries." *Id.*; *cf. Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006) ("Injunctions issue to curtail palpable risks of future injury").

During oral argument, counsel for TCG acknowledged that "some" of TCG's loss, such as the loss of certain re-order sales, "can be quantified" and remedied by money damages.[5] This acknowledgment counters its argument of irreparable harm as to these potential damages. *See D.U.*, 825 at 339. In addition, TCG has not submitted any evidence or argument concerning a

---

[5] TCG does not contend that that it will encounter collection difficulties after trial. *See Lakeview*, 446 F.3d 657 ("Ability to *calculate* damages does not make that remedy adequate, however, if the plaintiff cannot *collect* the award").

loss of goodwill.[6] *Contra Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008) ("[A] serious risk to . . . significant goodwill . . . can constitute irreparable harm"); *Lineback v. Chauffeurs, Teamsters, & Helpers Local Union No. 414*, 513 F. Supp. 2d 988, 998 (N.D. Ind. 2007) ("Continuing this conduct could cause further shutdowns, loss of goodwill, permanent loss of customers and business, and layoffs. This is sufficient to show irreparable injury allowing the issuance of an injunction"). Moreover, TCG knew about RedStitch in January 2016, and issued a cease-and-desist letter in August 2016, but did not seek a preliminary injunction until November 2016. (R.1 ¶ 81; R.6). "Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered." *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001); *see also Jones*, 2016 WL 7030354 at *6-7.

In addition, TCG has not made a "clear showing" that Defendants are likely to engage in a form of "ongoing competition" which, under Illinois law, serves "as a sufficient basis for [injunctive] relief." *Hess*, 415 F.3d at 633; *D.U.*, 825 F.3d at 339 ("issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief") (citation omitted); *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 804 (N.D. Ill. 2011) ("And there is no proof that Pampered Chef's competitive position has been or is likely to be compromised without an injunction"). Defendants have represented that, to date, the majority of RedStitch's work has been in design

---

[6] Relatedly, TCG's citation to *Jano Justice Systems Inc. v. Burton*, 636 F. Supp. 2d 763, 767 (C.D. Ill. 2009), is not persuasive. While the *Jano* court observed that, "under Illinois law, irreparable harm has been presumed in cases where a former insider lures customers away through a competing business[,]" *see id.*, it cited to *Tyler Enterprises of Elwood, Inc. v. Shafer*, 214 Ill. App. 3d 145, 150, 573 N.E.2d 863, 866 (3d Dist. 1991), for that proposition. The *Tyler* court, meanwhile, presumed irreparable injury where the plaintiff-employer had a "protectable interest in the clientele with which it had established long-term individual relationships," including "ten years [of] cultivating their loyalty and trust." *Id.* TCG has made no similar showing here with respect to its client relationships.

and strategy, not production and logistics, and for customers with whom Davenport and Kurz did not work while at TCG. TCG has submitted no evidence to refute this representation, apart from a hearsay statement concerning RedStitch's representation of WWW, "a major TCG client formerly managed by Davenport, Kurz, O'Donnell, and Solomon." (R.42, Adams Decl. ¶ 81).[7] Based on the record before it, the Court is not convinced that TCG's purported inability to "pin[] down what business has been or will be lost[,]" and to "identify which contracts slipped from its grasp" as a result of Defendants' alleged contractual breaches, necessarily constitutes "irreparable harm" entitling TCG to the extraordinary and drastic remedy of a preliminary injunction. *See Hess*, 415 F.3d at 632-33.[8] Given, however, the Seventh Circuit's caution in *Hess*, 415 F.3d at 632-33, and *Lakeview*, 446 F.3d at 657-58, concerning the irreparability of harm in restrictive covenant cases, the Court proceeds to the balancing portion of its analysis. *See BBL*, 809 F.3d at 323-24.

### III. The Balance of Harms

The Court, accordingly, "weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts*, 549 F.3d at 1086. Here, even assuming that TCG's inability to pinpoint "lost business" constitutes irreparable harm for which there is no adequate remedy at law, the above-discussed enforceability concerns

---

[7] Adams further attests that he has "confirmation of [solicitation] from multiple clients," but he does not clarify whether any Defendant serviced any of those client accounts. (R.43, Suppl. Adams Decl. ¶¶ 19-21). In addition, he does not submit any "corroborating evidence of the same." (*Id.*).

[8] At oral argument, counsel for TCG argued that TCG's harm was irreparable because certain damages "could never be quantified" insofar as "when you have a customer for 15 years then you suddenly lose that, how do know how long you would have been able to keep that customer? . . . That's what it makes it irreparable." Given the competitive nature of the POP display industry and TCG's failure to argue for or establish customer goodwill, however, it is unclear to the Court whether this future harm "eludes calculation because it is speculative" or whether it eludes calculation because, "if it occurred, it could not be quantified." *Bellon Wrecking*, 414 F.3d at 705-06. If the former, preliminary relief is not available. *See id.*

15

appear fatal to TCG's contract claims. *See id.* ("the court employs a sliding scale approach: the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor") (citation and quotation omitted). While compliance with a *reasonable* contractual restriction may "cost[] . . . nothing," *see Lakeview*, 446 F.3d at 657, *see also Arcadia Health Servs., Inc. v. A+ Health Care, Inc.*, No. 96 C 8363, 1997 WL 24737, at *5 (N.D. Ill. Jan. 17, 1997) ("She is simply getting that for which she bargained"), here, Sections 7 and 9 of the Employment Agreements likely operate as an unlawful restraint on trade in the POP display industry. That Davenport, Kurz, and Solomon remain free to work with any customer *besides* the 600 identified in TCG's CRM database (R.43, Suppl. Adams Decl. ¶ 3), does not tip the balance of equities in favor of TCG. Furthermore, as TCG observes, the public interest favors the enforcement of "valid" contracts and the protection of "confidential" information. *See Automed Techs., Inc. v. Microfil, LLC*, No. 04 C 5596, 2006 WL 1647505, at *3 (N.D. Ill. June 7, 2006), *aff'd in part*, 244 F. App'x 354 (Fed. Cir. 2007). In so observing, however, TCG ignores the very overbreadth issues afflicting its contracts.

Ultimately, "based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case[,]" *Jones*, 2016 WL 7030354 at *5, the Court does not view this case as "clearly demanding" the exercise of "a very far-reaching power[.]" *Girl Scouts*, 549 F.3d at 1085. Accordingly, the Court denies TCG's request for preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court denies the remainder of TCG's motion for preliminary injunctive relief. (R.21).

**Dated:** December 13, 2016

ENTERED

_____
AMY J. ST. EVE
United States District Court Judge